IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GLORIA MORRIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:23-cv-00642 |
| ) | Judge Aleta A. Trauger |
| SERVICE EXPERTS HEATING AND ) | |
| AIR CONDITIONING LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Before the court are (1) the Motion for Leave to Amend Answer and Assert Counterclaim Against Plaintiff Gloria Morris ("Motion to Amend") (Doc. No. 6) and (2) Motion to Compel Arbitration (Doc. No. 9), both filed by defendant Service Experts Heating and Air Conditioning LLC ("Service Experts"). As set forth herein, the Motion to Amend will be granted, and the Motion to Compel Arbitration will be denied.

**I. MOTION FOR LEAVE TO AMEND**

　**A.　Background**

Plaintiff Gloria Morris initiated this lawsuit against Service Experts in the Circuit Court for Davidson County, Tennessee in May 2023, asserting claims for negligence, negligent misrepresentation, breach of express warranty, breach of implied warranty, breach of contract, and gross negligence against Service Experts, all related to the installation of an HVAC unit in the plaintiff's condominium in May 2020. (*See* Complaint, Doc. No. 1-1.) On June 23, 2023, Service Experts removed the case to this court on the grounds of diversity jurisdiction. It filed its original Answer the same day. The Answer does not assert a counterclaim, but it raises as an affirmative

defense the existence of an arbitration agreement that "may" bar the plaintiff's lawsuit. (Doc. No. 3, at 6.)

On August 10, 2023, Service Experts filed its Motion to Amend and proposed Amended Answer and Counterclaim. (Doc. Nos. 6, 6-1.) The proposed Counterclaim asserts a single claim for breach of contract against Morris, arising out of her alleged breach of the agreement pertaining to the installation of the same HVAC unit that is the subject of Morris's claims. (Doc. No. 6-1, at 9–11.)

## B. Discussion

The plaintiff's Response in opposition to the Motion to Amend (Doc. No. 7) is premised entirely upon Federal Rule of Civil Procedure 13(a) and two Ohio district court opinions predating the 2009 amendments to the Federal Rules of Civil Procedure, *Hans v. Kevin O'Brien & Assocs. Co.*, CV 2-06-781, 2008 WL 222515, at *5 (S.D. Ohio Jan. 25, 2008), and *Awada v. Fast Track Ventures, LLC*, 3:04 CV 7318, 2005 WL 189707, at *3 (N.D. Ohio Jan. 28, 2005), which appear to hold that a compulsory counterclaim not raised in a defendant's initial responsive pleading is untimely and thus waived.[1] The plaintiff does not reference Federal Rule of Civil Procedure 15, and she does not contend that she would be prejudiced in any way by the filing of the Amended Answer and Counterclaim.

---

[1] In *Hans*, the court granted the plaintiff's motion to strike a counterclaim filed four months after the defendant's original answer as untimely, solely because the "cause of action arose before Plaintiff brought his legal malpractice action, [and the defendant] was obligated to file her compulsory counterclaim with her answer." *Hans*, 2008 WL 222515, at *5. Similarly, the court in *Awada* denied a motion for leave to file a counterclaim under Rule 13, solely because the "counterclaim was compulsory and required to be stated in [the defendant's] answer." *Awada*, 2005 WL 189707, at *3. At that time, Rule 13 included a provision stating: "When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment." Fed. R. Civ. P. 13(f) (abrogated by 2009 amendments). It is entirely unclear why the cited cases by the plaintiff failed to acknowledge this provision.

The defendant's Motion to Amend is clearly governed by Fed. R. Civ. P 15(a)(2).[2] Under Rule 15, a party may amend its pleading more than 21 days after serving the original pleading "only with the opposing party's written consent or the court's leave," which the court "should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). This rule, which establishes a liberal policy in favor of granting amendments, "reinforce[s] the principle that cases 'should be tried on their merits rather than the technicalities of the pleadings.'" *Inge v. Rock Fin. Corp.*, 388 F.3d 930, 936 (6th Cir. 2004) (quoting *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986)). "Thus, the trial court enjoys broad discretion in deciding motions for leave to amend." *Ousley v. CG Consulting, LLC*, 339 F.R.D. 455, 459 (S.D. Ohio 2021) (citing *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990)). In exercising its discretion, the trial court may consider such factors as "undue delay, bad faith or dilatory motive on the part of a movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment and futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

To be sure, Rule 13 states that a pleading "must" assert a compulsory counterclaim "at the time of its service," Fed. R. Civ. P. 13(a), but this provision simply means that a "party's failure to plead a compulsory counterclaim forever bars that party from raising the claim *in another action*." *Bauman v. Bank of Am., N.A.*, 808 F.3d 1097, 1101 (6th Cir. 2015) (citation omitted). Indeed, for that reason, "[c]ourts are especially liberal in allowing leave to assert a compulsory

---

[2] Rule 13 was amended in 2009 to delete subsection (f) altogether. The Advisory Committee Note to the 2009 amendments states: "Rule 13(f) is deleted as largely redundant and potentially misleading. An amendment to add a counterclaim will be governed by Rule 15." Fed. R. Civ. P. 13 advisory committee's note to 2009 amendment. Likewise, the note to Rule 15 confirms that the "[a]brogation of Rule 13(f) establishes Rule 15 as the sole rule governing amendment of a pleading to add a counterclaim." Fed. R. Civ. P. 15 advisory committee note to 2009 amendment.

counterclaim." *Croskey v. Union Sec. Ins. Co.*, No. 1:09-CV-400, 2009 WL 3401162, at *2 (W.D. Mich. Oct. 16, 2009).

The proposed amendment in this case was not unduly delayed; it was filed before entry of a scheduling order or the commencement of discovery. The plaintiff does not allege prejudice, nor does the court perceive any possibility of prejudice. None of the relevant factors weighs against amendment, and the fact that the counterclaim is apparently compulsory weighs strongly in favor. The defendant's Motion to Amend, therefore, will be granted.

## II. MOTION TO COMPEL ARBITRATION

### A. Background

The defendant asks the court to compel arbitration and stay or dismiss this case, under 9 U.S.C. § 3, based on a written arbitration agreement. It argues that federal law favors enforcement of valid arbitration agreements (Doc. No. 9-1, at 2 (citing *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018))), and it asserts that it has not waived its right to compel arbitration under the agreement by acting "in a manner 'completely inconsistent with any reliance on an arbitration agreement' or delay[ed] asserting arbitration 'to such an extent that the opposing party incur[red] actual prejudice.'" *Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 827–28 (6th Cir. 2015) (quoting *Hurley v. Deutsche Bank Tr. Co. Ams.*, 610 F.3d 334, 338 (6th Cir. 2010)). (*See* Doc. No. 9-1, at 2.)

The defendant filed the purported arbitration agreement with both its Motion to Amend and the Motion to Compel Arbitration. The primary agreement between Morris and Service Experts appears to be the Service Experts Advantage Program Agreement ("SEAPA"), a two-page document pursuant to which the plaintiff apparently agreed to pay Service Experts, doing business as Donelson Air, $15,112.50 for the privilege of *leasing* an HVAC system that otherwise would have cost $10,282. (Doc. No. 9-2, at 8.) On its face, the SEAPA required the plaintiff to pay

$162.50 per month for 93 months, or 7 years and 9 months. (*Id.*) At the end of that period, the "lease" would terminate. The SEAPA specifically states that the plaintiff did "not have an option to purchase the leased property at the end of the term." (*Id.*) The SEAPA directs the signatory to "[s]ee your Lease for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, insurance, and any security interest." (*Id.*) It does not appear that the SEAPA was accompanied by any document identified as a "lease."

The plaintiff's electronic signature appears on page 2 of the SEAPA, just below this statement:

> I HAVE READ AND UNDERSTAND THIS AGREEMENT, FEDERAL CONSUMER LEASING ACT DISCLOSURE, STATE SPECIFIC ADDENDUM, TERMS AND CONDITIONS PROVIDED ON THIS AGREEMENT AND I ACKNOWLEDGE THAT I HAVE BEEN PRESENTED WITH MULTIPLE OPTIONS INCLUDING AN OPTION TO PURCHASE THE EQUIPMENT.[3]

(*Id.* at 9.) This page also contains a time stamp indicating that it was digitally signed by Service Experts on May 21, 2021, in conjunction with an "eDoc Consent Agreement" and "Terms and Conditions Agreement," as follows:

> Digitally signed by Service Experts LLC
> Date 2020.05.21 10:56:34 -06:00
> Reason:
> eDoc Consent Agreement: 5/21/2020 10:53:28 AM
> Terms and Conditions Agreement: 5/21/2020 10:56:34 AM
> Home Owner Identifier: 7705
> CO-Home Owner Identifier (if present):
> Sales Representative Initials: MW
> Location: [Plaintiff's home address]

(*Id.*)

---

[3] The SEAPA itself largely consists of the "Federal Consumer Leasing Act Disclosures" (*see* Doc. No. 9-2, at 8), but there is no evidence that the plaintiff was shown a State Specific Addendum.

Another document was purportedly attached to the SEAPA, entitled "Advantage HVAC Terms and Conditions." (Doc. No. 9-2, at 1.) This document does not identify the plaintiff by name or give her address, and it is inconsistent in several respects with the SEAPA. In particular, it identifies the term of the agreement as 120 months (rather than 93 months). (*Id.* at 1 ¶ 2.) It also contains a "Termination Option," which includes a purchase option (which the SEAPA expressly contradicts). (*Id.* at 7 ¶ 17.) Pursuant to this provision, the lessor could "terminate" the agreement and keep the HVAC unit for a "fee" based on the date of termination.[4]

The Terms and Conditions incorporate a provision for "Mandatory Arbitration of Disputes." (*Id.* at 6 ¶ 16.) This provision expressly requires arbitration of "[a]ny dispute, disagreement or claim between you and Service Experts arising out of or in connection with this Agreement[5] . . . which cannot be amicably resolved." (*Id.*) The arbitration is to be conducted in accordance with the Consumer Arbitration Rules of the American Arbitration Association at a location convenient to the consumer. (*Id.*)

The plaintiff filed a Response in Opposition to the Motion to Compel Arbitration in which she argues that she did not agree to "any portion of the document entitled Terms and Conditions," that there was no mutual assent to those terms, and, therefore, that there is no valid contract

---

[4] Pursuant to this provision, for example, the consumer could "terminate" the agreement between 7 and 8 years by paying a "fee" of 79% of the "Total installed cost." (Doc. No. 9-2, at 7 ¶ 17.) As applied to the plaintiff, this would have meant that, if she terminated the agreement after seven and one-half years, after having already paid almost $15,000 for a unit valued at $10,282, she would only own it if she paid an additional "fee" equivalent to 79% of the $10,282 "Total Installed Cost" (identified on the SEAPA).

[5] The "Agreement" is defined in paragraph 1 only as "this agreement." (Doc. No. 9-2, at 1 ¶ 1.) Paragraph 1 also refers to the "Home Owner" as the "owner of the Premises on which the Equipment will be installed," and defines "Premises" as "the Installation Address set out on the first page of this Agreement." (*Id.*) The first page of the Terms and Conditions does not contain any identifying information, so it presumably intends to incorporate an actual agreement—perhaps the SEAPA.

incorporating those terms. (Doc. No. 12, at 3.) She points out that the SEAPA refers to the "terms and conditions provided *on* this agreement," without specifically referencing or incorporating a separate document. (*Id.* at 4 (emphasis added).) In addition, the plaintiff also submitted an Affidavit, in which she specifically avers that she entered into an agreement with Service Expert for the installation of an HVAC unit in her condominium in May 2020, but the only document she was shown in connection with that agreement, and the only document she signed, was the two-page SEAPA. (Doc. No. 12-1, Morris Aff. ¶¶ 2–3.) She expressly denies being shown the document entitled "Terms and Conditions" (*id.* ¶ 5) and does not recall ever having seen it before her attorney showed it to her on August 3, 2023 (*id.* ¶ 6). She also states that the Terms and Conditions were never discussed with her when she signed the SEAPA and that she did not agree to the Terms and Conditions verbally or in writing. (*Id.* ¶ 7.)

The defendant filed a Reply, along with the Declarations of Michael Waggoner, Senior Regional General Manager for Service Experts, and Michael Wadsley, former Service Experts sales representative. Wadsley attests that he is now retired but was the Service Experts sales representative who presented Morris with the SEAPA, "including Terms and Conditions." (Doc. No. 16-2, Wadsley Decl. ¶¶ 1–3.) In May 2020, according to Wadsley, Service Experts was in the process of "transitioning to digital agreements." (*Id.* ¶ 4.) Wadsley states that, on May 21. 2020, his supervisor, Michael Waggoner, assisted him in preparing the "Agreement and its incorporated Terms and Conditions" on an electronic tablet (specifically an iPad), for Wadsley to present to Morris. (*Id.* ¶ 5.) He claims that he did so and that Morris was "provided with an opportunity to read and review the Agreement's Terms and Conditions, which would have auto-populated for her on the table prior to her digitally signing." (*Id.* ¶ 7.) Wadsley attests that Morris "electronically

signed consented [sic] to the Terms and Conditions which were part of the Agreement via digital signature after she was given the opportunity to review." (*Id.* ¶ 8.)

In its Reply, the defendant argues that the eConsent documentation appearing below the plaintiff's electronic signature on the SEAPA—referencing the Terms and Conditions as well as the "Home Owner Identifier," which the defendant claims is a four-digit number provided by the plaintiff—confirms that Morris also consented to the Terms and Conditions when she signed the SEAPA. (Doc. No. 16, at 3.) It claims that it was only because Service Experts was in the process of transitioning to digital agreements that the SEAPA and Terms and Conditions were "two separate documents," but that the Terms and Conditions would have "appeared as a separate 'pop-up window'" for Morris to "review and accept before digitally signing the Agreement and incorporated Terms and Conditions." (*Id.* at 2.) Service Experts insists that the digital stamp referencing "Terms and Conditions" below the plaintiff's electronic signature effectively refutes her claim not to have seen the Terms and Conditions and, because she had the opportunity to review the Terms and Conditions before signing the SEAPA, a valid contract was formed, and the court must enforce the arbitration provision.

B.     **Legal Standard**

The question of whether Morris's claim must be arbitrated is governed by the Federal Arbitration Act ("FAA"). 9 U.S.C. §§ 1 *et seq.* The FAA allows parties to a "contract evidencing a transaction involving commerce" to agree that certain disputes between them arising from such "contract or transaction" will be decided by an arbitrator rather than by a court. 9 U.S.C. § 2. Described by the Supreme Court as the "primary substantive provision" of the FAA, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), Section 2 further provides that any such agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This section

embodies "a liberal federal policy favoring arbitration." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone*, 460 U.S. at 24). The principal purpose of the FAA is to ensure the enforcement of private arbitration agreements according to their terms; the broader purpose of allowing parties to submit grievances to arbitration is to facilitate "efficient, streamlined procedures tailored to the type of dispute" at issue. *Id.* at 344 (citations omitted); *see also Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) ("The FAA was designed to override judicial reluctance to enforce arbitration agreements, to relieve court congestion, and to provide parties with a speedier and less costly alternative to litigation.").

Despite this liberal federal policy favoring arbitration agreements, arbitration is a "matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986); *see also GGNSC Louisville Hillcreek, LLC v. Est. of Bramer*, 932 F.3d 480, 485 (6th Cir. 2019) ("An agreement to arbitrate is fundamentally a matter of consent."). Thus, when considering a motion to compel arbitration, a district court must determine, as a threshold matter, if the parties agreed to arbitrate. *McGee v. Armstrong*, 941 F.3d 859, 865 (6th Cir. 2019); *Stout*, 228 F.3d at 714. Whether a valid agreement to arbitrate exists is determined by state law. 9 U.S.C. § 2; *GGNSC Louisville*, 932 F.3d at 485.

To show that the validity of the agreement to arbitrate is "in issue," the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate. *Great Earth Cos. v. Simons*, 288 F.3d 878 (6th Cir. 2002). "The required showing mirrors that required to withstand summary judgment in a civil suit." *Id.* Therefore, the court reviews the facts in the light most favorable to the plaintiff in order to determine whether the evidence presented raises a genuine question of material fact such that a finder of fact could conclude that

no valid agreement to arbitrate exists. *Id.* (citing *Aiken v. City of Memphis*, 190 F.3d 753, 755 (6th Cir. 1999)). Any doubts regarding arbitrability, however, must be resolved in favor of arbitration. *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (citing *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003)); *see also Great Earth Cos.*, 288 F.3d at 889 ("[A]ny ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration.").

If the party seeking to compel arbitration establishes the existence of a valid agreement to arbitrate the dispute, the court must grant the motion to compel arbitration and stay or dismiss proceedings until the completion of the arbitration. *Lehman Bros.*, 394 F.3d at 451 (citing 9 U.S.C. §§ 3–4).

  **C.**  **Analysis**

As the party moving to compel arbitration, Service Experts bears the ultimate burden of establishing the existence of a valid agreement to arbitrate and must, as an initial step, come forward with some evidence showing that the plaintiff agreed to arbitrate. *See Foust v. Comcast Corp.*, No. 3:19-CV-173-HSM-DCP, 2020 WL 1891755, at *4 (E.D. Tenn. Jan. 28, 2020) (citations omitted); *see also Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co.*, 823 F. Supp. 2d 786, 803 (W.D. Tenn. 2011) ("Under Tennessee law, a [party] alleging breach of contract must prove (1) the existence of a contract . . . ." (citation omitted)). "[O]nce *prima facie* evidence of the agreement has been presented, the burden shifts to the party opposing arbitration." *Foust*, 2020 WL 1891755, at *4 (citation omitted).

Service Experts has come forward with some evidence showing that the plaintiff agreed to arbitrate, in the form of the signed SEAPA and the Terms and Conditions it claims were incorporated into the SEAPA. It argues that the digital agreement presented to the plaintiff resembled either a "clickwrap agreement," a "browsewrap agreement," or a "hybrid of both," and

that these types of agreements have been upheld in this district. *See, e.g.*, *Scott v. RVshare LLC*, No. 3:21-cv-00401, 2022 WL 866259, at *4 (M.D. Tenn. Mar. 22, 2022) (Campbell, J.) (granting a motion to compel arbitration based on adequate notice of the terms of the agreement, whether considered a clickwrap or a browsewrap agreement);[6] *see also Anderson v. Amazon.com, Inc.*, 490 F. Supp. 3d 1265, 1274 (M.D. Tenn. 2020) (distinguishing between clickwrap and browsewrap agreements and upholding an agreement containing arbitration agreement as neither procedurally nor substantively unconscionable under Tennessee law).

Service Experts' reliance on *Scott* and *Anderson* in this case is misplaced, however, because the court is not confronted with the question of whether the arbitration agreement is enforceable, but whether the plaintiff was ever presented with it at all. The plaintiff states unequivocally that she "was never shown the document entitled 'Terms and Conditions' on the day [she] signed the [SEAPA]." (Morris Aff. ¶ 5.)

The defendant points to the time stamp on the SEAPA and its reference to the Terms and Conditions as effectively refuting the plaintiff's statement that she does not "recall" seeing the Terms and Conditions until after initiating this lawsuit. (Doc. No. 16, at 4.) Contrary to the defendant's suggestion, however, the plaintiff does not merely state that she does not recall seeing the Terms and Conditions—she denies being shown the Terms and Conditions when she signed the SEAPA. The court understands her statement that she also does not recall seeing the Terms and Conditions before to mean that the defendant never mailed her a physical copy of the agreement she purportedly signed. The time stamp, therefore, is evidence that the plaintiff had

---

[6] As Judge Campbell explained in that case, a "clickwrap agreement" may be formed when an internet user "click[s] a box to acknowledge that [she has] read [the] terms and conditions" to which she is consenting, while a "browsewrap agreement" may be formed when a "website merely provides a link to the terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process." *Scott*, 2022 WL 866259, at *3 (citation omitted).

notice of the Terms and Conditions when she signed the SEAPA, but it is not incontrovertible evidence.[7]

Michael Wadsley's Declaration is also evidence that conflicts with the plaintiff's sworn statement, but it is likewise not incontrovertible evidence. Wadsley states that the Terms and Conditions would have "auto-populated" on the iPad screen before Morris signed the SEAPA. He does not actually explain the mechanism by which this would have occurred. Instead, he acknowledges that the company was in the process of transitioning to digital agreements in May 2020 and that he required his manager's help in setting up the agreement, all of which suggests that he would not have been entirely comfortable with the format or the procedure for obtaining a digital signature at the time.[8]

The fact that some of the terms of the SEAPA conflict materially with the terms of the Terms and Agreements, as indicated above, further calls into question whether the Terms and Conditions presented by the defendant are the same "terms and conditions" referenced in the

---

[7] This case is distinguishable from *Sellers v. Macy's Retail Holdings, Inc.*, No. 2:12-cv-02496-SHL-tmp, 2014 WL 2826119 (W.D. Tenn. June 23, 2014), for example, in which the plaintiff claimed that she did not recall signing an agreement to arbitrate, but the record contained "uncontroverted evidence that [the plaintiff] electronically signed the New Hire Acknowledgment form on November 18, 2009, the date of her hire" and that she did not return the opt-out form within thirty days of her hire. *Id.* at *5. In addition, the employer had informed her of the arbitration agreement through "the SIS Program brochure, Plan Document, opt-out Election Form, New Hire Acknowledgment form, and new hire informational video." *Id.* at *7. By signing the acknowledgment form, the plaintiff acknowledged receipt of the brochure, Plan Document, and opt-out Election Form. *Id.* The court found that the plaintiff's unsupported and conclusory statement that she did not remember signing the form did not create a material factual dispute, in light of the defendant's documentation that she had signed the acknowledgement form and had received the various documents describing the agreement. *Id.* at *9. *Accord Manigault v. Macy's East, LLC*, 318 F. App'x 6, 8 (2d Cir. 2009); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735–36 (7th Cir. 2002); *Mecherle v. Trugreen, Inc.*, No. 12 C 1617, 2012 WL 4097221, at *2 (N.D. Ill. Sept. 14, 2012).

[8] Michael Waggoner also attests that Morris's "digital signature incorporates the Agreement and the Terms and Conditions." (Waggoner Decl. ¶ 6.) He was apparently not present at the time and does not speak from personal knowledge.

SEAPA. In addition, the SEAPA refers to a "lease" that does not appear to have been presented to the plaintiff, further substantiating the plaintiff's assertion that she was never presented with a separate document entitled "Terms and Conditions."

In sum, viewing the facts in evidence in the light most favorable to the plaintiff, the court finds that there is a material factual dispute as to whether the plaintiff was ever presented with the Terms and Conditions containing the arbitration provision and, therefore, a question of fact as to whether she had notice of the arbitration provision or validly consented to arbitration. Because there is a material factual dispute as to whether Morris had notice of the arbitration provision and voluntarily agreed to submit disputes related to the SEAPA to arbitration, the defendant's Motion to Compel Arbitration must be denied.

## III.  CONCLUSION

For the reasons set forth herein, the court will grant the defendant's Motion to Amend (Doc. No. 6) but deny its Motion to Compel Arbitration (Doc. No. 9). An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge